UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
            v.           )    CRIM. NO. 05-10078-NMG
                         )
DARRYL DOWDELL           )

## GOVERNMENT'S OPPOSITION TO MOTION IN LIMINE REGARDING TAPED STATEMENTS MADE BY ROBERT WHITE

_____Defendant Darryl Dowdell has filed a motion in limine in which he asks the Court to preclude the government from introducing statements made on tape by his accomplice Robert White during two buys the DEA made from White 10 days before the offense at issue here.  In the taped conversations, White references Dowdell (using Dowdell's street name, "Smoke") as someone who is involved in White's drug activity and someone from whom the DEA undercover agent can purchase drugs in White's absence.  When the same undercover agent returned to the same area 10 days later, he approached Dowdell and asked him where he, the UC, could find White.  Dowdell immediately told the UC where to go and, after the UC returned and claimed the he could not find White, sold the UC $200 of crack cocaine.

There are two reasons why the statements made by Allen (and the tapes containing them) are admissible in this case.  The first, of course, is that the evidence establishes that they are co-conspirator statements admissible under FRE 801(d)(2)(E).  Under Fed. R. Evid. 801(d)(2)(E), co-conspirator statements are

not hearsay if "made by a coconspirator of a party during the course and in furtherance of the conspiracy." [1]

The statements at issue are admissible on other bases as well. As the government understands it, the principal defense at trial will be identification, i.e, that the UC simply got the wrong guy and that his identification of Dowdell is based on a single, brief transaction and is therefore unreliable. In fact, the events of July 6 show that the UC had multiple prior opportunities to see (and speak with) Dowdell prior to July 16 and that his identification of Dowdell is therefore based on multiple observations and the UC therefore recognized him from the moment he saw Dowdell standing near Ruggles Street on July 16. The fact that White identified Dowdell as the person from who the UC could purchase drugs in White's absence also shows that the UC had particular reason to pay careful attention to who Dowdell was, therefore making the content of this information admissible for identification purposes as well. If the court determines that White's statements are admissible solely because

---

1. Under Petrozziello v. United States, 548 F.2d 20 (1st Cir. 1977), a preponderance-of-the-evidence standard governs this Court's preliminary determination of the admissibility of such statements. Because a preponderance of the evidence which the government expects to introduce at trial will demonstrate that: (1) White and Dowdell were jointly engaged in the sale of crack cocaine; and, (2) all of the statements of White whose admission the government is seeking to introduce were made during the course and in furtherance of those activities, the statements that the government will seek to introduce from 7/6/01 are properly admissible against Dowdell.

2

they are relevant to the UC's ability to recognize Dowdell, then a limiting instruction regarding the reason for admitting the evidence would be appropriate.

### A. BACKGROUND

On November 14, 2004, the defendant was named in a one-count criminal complaint charging him with a violation of 21 U.S.C. §841.  Both the complaint and the affidavit that supported it made clear that the government was alleging that the defendant sold cocaine base, a/k/a "crack cocaine" to a DEA undercover agent ("the UC") on July 16, 2001.

On March 23, 2005, a grand jury returned an indictment against Dowdell based on this same transaction.  Although the transaction involved cocaine base, the indictment merely alleged that the defendant distributed "cocaine."

All of the events giving rise to these charges arose out of investigations undertaken by the DEA and local law enforcement in 2001 aimed at attacking drug trafficking in and around the Whittier Street Project near Ruggles Square in Boston.  During these investigations, a DEA Task Force Agent (hereinafter, "the UC") made controlled purchases of drugs from various individuals (including Dowdell and White).  The buys were made out of an undercover car equipped with audio and video recording equipment. The UC also wore a transmitter so as to enable other surveillance officers to monitor the buys.  All conversations coming over the

transmitter were also recorded as they occurred.

The present case involves such operations on two separate dates (both of which will be the subject of trial testimony from undercover officer Joao Monteiro). All of the statements made by White (which are the subject matter of this motion) took place on the first day, July 6, 2001. It is these events (including the statements made and actions by both White and Dowdell) that then led to the buy made form Dowdell 10 days later.

On the afternoon of July 6, 2001, the UC made two buys from Robert White. The two buys were separated by approximately an hour. When the UC approached White the first time on July 6, White and Dowdell were counting money together. After noticing the UC, White immediately approached the UC and indicated (after consulting with Dowdell and then getting in the car with the UC in preparation of making a sale), that Dowdell was in the business with him. White then proceeded to sell the UC drugs and urged him to come back later that day to do another deal. He also told the UC to see him or Dowdell (described in that conversation as a dark skinned dude and later as White's cousin, "Smoke") for more crack cocaine.

And that's exactly what the UC did. Within an hour, he returned to Whittier Street Project, saw Dowdell (who he also referred to as Smoke), and asked Dowdell if he could buy crack cocaine. Smoke told the UC to wait for a minute, and the UC

4

watched as Dowdell rode his bicycle to White.  After speaking with Dowdell, White came over to the UC, got back in his car, and sold him more crack cocaine.  Hence in the first deal, White invited the UC to contact Dowdell ("Smoke") to make future buys. In the second deal, the UC did, and Dowdell helped set up the buy from White that then took place.  Further information regarding the events of July 6 and the specific statements White and Dowdell made are set forth in the DEA-6 attached as Exhibit 1.

The working relationship between White and Dowdell was further bourne out 10 days later (on July 16) when the buy at issue here took place.  After driving into the area of the Project (and not finding White), the UC went up to Dowdell (referring to him on the video as "Smoke") and asked him where White (who the UC referred to as "TD") was.  After getting directions from Dowdell, and making it appear that he had looked for White but was unable to find him, the UC returned to the area where Dowdell was, approached Dowdell for a second time, and bought the crack cocaine that is the subject of the charges currently before the Court.  See DEA-6 attached as Exhibit 2.

## B.  WHITE'S STATEMENTS ARE ADMISSIBLE UNDER FRE 801(D)(2)(E)

### 1. LEGAL STANDARD FOR ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

Federal Rule of Evidence 801(d)(2)(E) defines a coconspirator statement as "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

The admissibility of such statements is governed by United States v. Petrozziello, 48 F.2d 20, 23 (1st Cir. 1977), which requires that the government prove the existence of the conspiracy and the defendant's membership in it by a preponderance of the evidence.

In United States v. Ciampaglia, 628 F.2d 632 (1st Cir. 1980), the Court outlined the procedures to be employed when co-conspirator statements are offered into evidence:

> if the government attempts to introduce a statement under Fed.R.Evid. 801(d)(2)(E), the Court, upon proper objection, may, if it so chooses, admit the declaration subject to it being "connected up."  At that time the court should inform the parties out of the hearing of the jury that:  (a) the prosecution will be required to prove by a preponderance of the evidence that a conspiracy existed, that the declarant and defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of the conspiracy, (b) that at the close of all the evidence the court will make a final Petrozziello determination for the record, out of the hearing of the jury; and, (c) that if the determination is against admitting the declaration, the court will give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice.

Ciampaglia, 628 F.2d at 638 (footnotes omitted).  In determining the admissibility of co-conspirator statements, the Court may consider any relevant evidence, including the statement sought to be admitted.  See, e.g., Bourjaily v. United States, 483 U.S. 171, 181 (1987); United States v. Rivera-Santiago, 872 F.2d 1073, 1092-93 (1st Cir. 1989).  Statements made by a co-conspirator during and in furtherance of the conspiracy are admissible against each co-conspirator regardless of whether the declarant is even named in the indictment or charged with conspiracy.  See

United States v. Zipperstein, 601 F.2d 281 (7th Cir. 1979).  Cf.
United States v. Smith, 596 F.2d 319 (8th Cir. 1979); United
States v. Scavo, 593 F.2d 837 (8th Cir. 1979); United States v.
Durland, 575 F.2d 1306 (10th Cir. 1978).

     Once a given defendant joins a conspiracy, the statements of
his co-conspirator statements are admissible against him
regardless of when his involvement began.  See United States v.
Masse, 816 F.2d 805, 811 (1st Cir. 1987) ("statement made by a
co-conspirator . . . in furtherance of the conspiracy . . .
admissible against the defendant even if made prior to the
defendant's involvement in the conspiracy").  See also United
States v. Reynolds, 828 F.2d 46, 47 (1st Cir. 1987) (same).  As
the First Circuit explained in United States v. Baines, 812 F.2d
41, 42 (1st Cir. 1987), "a conspiracy is like a train.  When a
party knowingly steps aboard, he is part of the crew, and assumes
conspirator's responsibility for the existing freight -- or
conduct -- regardless of whether he is aware of just what it is
composed."

     Nor is it necessary for the government to prove that
each coconspirator knew of or had contact with all other members,
or that they knew all of the details of the conspiracy or
participated in every act in furtherance of it.  "The [finder of
fact] may infer an agreement circumstantially by evidence of,
inter alia, a common purpose (such as a purpose to sell illicit

drugs), overlap of participants, and interdependence of various elements in the overall plan.  United States v. Martinez-Medina, 279 F.3d 105, 113-114 (1st Cir.2002).  See also United States v. Marino, 277 F.3d 11, 25 (1st Cir. 2002) ("As long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of.").

## 2. PETROZIELLO IS SATISFIED HERE

To conclude that the government has satisfied its burden under Petrozzielo here, the Court need go no further than the events of July 6, when TFA Monteiro made two buys of crack cocaine from White with the assistance of Dowdell.  As set forth above, White told the UC during the first July 6 buy that the dark skinned guy (Dowdell) was involved and that, if the UC should return and not find him, then the UC should talk to him (referred to the second time as Smoke.  Dowdell then played his part by determining that the UC was looking for drugs when the UC returned later that afternoon and letting White know both that the UC was there and what the UC wanted.  Because both men thus plainly acknowledged their drug relationship, this evidence more than satisfies the government's initial burden under Petroziello. E.g., United States v. Geronimo, 330 F.3d 67, 76 (1st Cir. 2003)

8

(affiriming <u>Pertozziello</u> finding based on numerous phone calls
among the conspirators and statements made during drug related
meetings and deliveries); <u>United States v. Newton</u>, 326 F.3d 253,
259 (1st Cir. 2003) (uncontradicted statements describing
activity included in the conspiracy sufficient to uphold
<u>Petrozziello</u> finding); <u>United States v. Portela</u>, 167 F.3d 687,
703 (1st Cir. 1999)(phone records and phone book entry containing
co-conspirator's number held to constitute adequate corroborating
evidence, extrinsic to Rule 801(d)(2)(E) admissions, that
defendant was a party to the conspiracy).

### 3. <u>WHITE'S STATEMENTS WERE MADE IN FURTHERANCE OF AND DURING THE CHARGED CONSPIRACY</u>

The only remaining issue surrounding admissibility is whether
White's statements were made "during" and "in furtherance of" the
conspiracy.  To be deemed "in furtherance," a statement "need not
be necessary or even important to the conspiracy, or even made to
a co-conspirator, as long as it can be said to advance the goals
of the conspiracy in some way." <u>United States v. Martinez-
Medina</u>, 279 F.3d 105, 117 (1st Cir. 2002).  A preponderance
standard governs this finding as well.  <u>E.g.</u>, <u>United States
v.Perez-Ruiz</u>, 353 F.3d 1, 11 (1st Cir. 2003).[2]

---

2.  The "in furtherance" requirement provides a limited
exception to the admissibility of co-conspirator statements that
is intended to keep out "idle conversations among criminal
partners," as well as for statements clearly intended to foil
rather than facilitate the criminal enterprise.  <u>Martinez-Medina</u>,
279 F.3d at 117, <u>citing</u> 5 Weinstein, <u>Federal Evidence</u> § 801.34

The evidence here plainly meets this test.  All of White's statements were made on July 16, as the UC was attempting to make buys of crack cocaine from him using the assistance of Dowdell. All of the statements involved White's efforts to market drugs and negotiate, set up or consummate specific deals (including efforts to convince the UC to come back for a third time and provide Dowdell as an alternate source to ensure that the UC's need would be met).  Because that was the essence of the conspiracy between White and Dowdell (i.e, mutual assistance in the marketing of crack cocaine), each of the statements was also made in furtherance of the charged conspiracy and is therefore admissible under F.R.E. 801(d)(2)(E).  See United States v. McCarthy, 961 F.2d 972, 978 (1st Cir. 1992) (conversation regarding details of proposed drug deal held to be in furtherance of conspiracy); United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983) ("Statements between the conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as

---

(2d ed. 2001).  Recognizing the narrow reach of the "in furtherance" limitation, the First Circuit has recognized that a statement made by a co-conspirator need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way. Id.  See also United States v. Piper, 298 47,54 (1st Cir. 2002)("a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy").

the other requirements of Rule 801(d)(2)(E) are met."); <u>United States v. Huber</u>, 2 F.3d 304, 305 (8th Cir. 1993) (conversations including negotiations to purchase cocaine, knowledge of earlier negotiations and plans to sell drugs all found to be "in furtherance of drug conspiracy); <u>United States v. Arambula-Ruiz</u>, 987 F.2d 599, 608 (9th Cir.1993)(statements which induce participation or prompt further action in the conspiracy are admissible under 801(d)(2)(E)).[3] <u>See generally</u>, Weinstein, <u>supra</u> at 801.34[5] (Many courts construe the in furtherance requirement so broadly that even casual relationships to the conspiracy suffice to satisfy the exception").[4]

## B. WHITE'S STATEMENTS ARE ALTERNATIVELY ADMISSIBLE BECAUSE THEY RELATE TO THE BASIS FOR THE UC'S IDENTIFICATION

Given the foregoing, there is no reason for the Court to look for any alternate grounds to admit the statements White made

---

3. White's identification of Smoke (Dowdell) as someone who the UC could go to was certainly in furtherance of the conspiracy as well. <u>See</u> <u>United States v. Masse</u>, 816 F.2d 805, 811 (1st Cir.1987)(upholding trial court's determination that the seller's identification of his source tended to advance the goal of the conspiracy because the declarant reasonably could have believed that an unsatisfactory answer to his customer's question would "queer the deal"); <u>United States v. Mason</u>, 658 F.2d 1263, 1270 (9th Cir. 1981)(statements amounting to reassurance treated as in furtherance of conspiracy); <u>United States v. Johnson</u>, 925 F.2d 1115, 1117 (8th Cir.1991) (statements identifying participants and discussing various roles admissible under 801(d)(2)(E)).

4. Authorities cited for this proposition by Weinstein <u>United States v. Goldberg</u>, 105 F.3d 770 (1st Cir. 1997) and <u>United States v. Flores-Rivera</u>, 56 F.3d 319-329-330 (1st Cir. 2002).

11

to the UC.  Yet one surely exists.  As set forth above, the
defendant's principal defense in this case will be the
reliability of the UC's identification of Dowdell.  In
considering that issue, both the number of times that Monteiro
met the defendant and the circumstances under which those
meetings took place are certainly relevant (and indeed critical)
issues.  See United States v. Henderson, 320 F.3d 92 (1st Cir.
2003) (strength of identification testimony increased where
witness made three drug buys from defendant).  Moreover, once
White told the UC to contact Dowdell if he needed drugs when
White was not around, the UC had that all the more reason to
focus on Dowdell's appearance.  See United States v. Telfaire,
469 F.2d 552 (D.D.C. 1972) (relevant factors in assessing
eyewitness identification include the capacity opportunity and
incentive for the witness to observe the offender reliably).  See
also United States v. Gray, 958 F.2d 9 (1st Cir. 1992)
(discussing utility of the Telfaire factors and instructions in
this circuit).  Hence, these statements are admissible, not the
for truth of the matter asserted, but for the impact that they
had on Monteiro and his subsequent identification of Dowdell.

    The only other issue raised by the defendant's motion is the
off-handed suggestion that White's testimony somehow raises a
Crawford issue.  Motion in Limine at 2.  The reason that the
suggestion is offhand (and unaccompanied by any supporting

12

citation) is of course that courts, post-Crawford, have found
that statements made by co-conspirators during the course of and
in furtherance of a conspiracy are not testimonial and do not
violate the Confrontation Clause within the meaning of Crawford.
E.g., United States v. Hansen, 434 F.3d 92 (1st Cir. 2006)("[T]he
challenged statements are nontestimonial because they are either
co-conspirator statements made during the course of and in
furtherance of the conspiracy, or casual remarks which the
declarant would not reasonably expect to be available for use at
a later trial.")  United States v. Arriola-Perez, 137 Fed. Appx.
119, 130 n.8 (10th Cir.2005)(rejecting Crawford argument in a
footnote by stating "[h]ere ... we are considering out-of-court
statements made in furtherance of a conspiracy, which have
historically been considered nontestimonial ...."); United States
v. Allen, 425 F.3d 1231, 1235 (9th Cir.2005)("[C]o-conspirator
statements are not testimonial and therefore beyond the compass
of Crawford's holding."); United States v. Jenkins, 419 F.3d 614,
618 (7th Cir.2005)("Crawford did not change the rules as to the
admissibility of co-conspirator statements."); United States v.
Canady, 139 Fed. Appx. 499, 501 (4th Cir. 2005)("The statements
at issue here were not testimonial, even under the broadest
interpretation of that term, as [the co-conspirator] clearly did
not realize that his statements to the informant were going to be
used against him at trial."); United States v. Hendricks, 395

F.3d at 183-84 ("[W]e conclude that the ... coconspirator
portions of the disputed [confidential informant] conversations
are nontestimonial and thus, assuming compliance with the Federal
Rules of Evidence, are admissible."); United States v. Logan, 419
F.3d 172, 178 (2d Cir. 2004)("In general, statements of
co-conspirators in furtherance of a conspiracy are
non-testimonial."); United States v. Robinson, 367 F.3d 278, 292
n.20 (5th Cir. 2004)("As applied to the present case, [the
constitutionality of rule 801(d)(2)(E)] is not called into doubt
by, Crawford v. Washington, because the statement challenged as
hearsay was made during the course of the conspiracy and is
non-testimonial in nature."); United States v. Reyes, 362 F.3d
536, 541 n.4 (8th Cir.2004)("Crawford does not support [the
defendant's argument] ... because co-conspirator statements are
nontestimonial.").

### E. CONCLUSION

     Based on the foregoing, the government submits that its
anticipated trial testimony, including the taped statements of
both Dowdell and White and the testimony of Monteiro regarding
their cooperative efforts on July 6, is more than sufficient to
establish by a preponderance of the evidence that Dowdell and
White were then part of a conspiracy formed for the purpose of
distributing cocaine.  The government therefore requests that it
be permitted to admit against Dowdell any statements made by

White on that date including the statements referenced on the reports attached as Exhibits 1 and 2.

Alternatively, even if the court concludes that the statements are inadmissible under FRE 801(d)(2)(E), the government requests that the statements of White and the circumstances behind Dowdell's involvement in the July 6 transactions be admitted for the limited purpose of showing the basis for the UC's familiarity with Dowdell's appearance and thus the reliability of the UC's subsequent eyewitness identification.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By:   /s/ John A. Wortmann, Jr.
      JOHN A. WORTMANN, JR.
      Assistant U.S. Attorneys
      One Courthouse Way
      Boston, MA 02210
      (617) 748-3207

# EXHIBIT 1

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 5

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| By: TFA Joao J. Monteiro | ☐ | | 6. File Title | |
| At: NEFD/Boston | ☐ | | | |
| | ☐ | | | |
| 7. ☐ Closed  ☐ Requested Action Completed | ☐ | | 8. Date Prepared | |
| ☐ Action Requested By: | | | 06/25/01 | |

9. Other Officers: G/S Brady, S/A Burke, TFA Henley, TFA Cardoza, TFA Ridlon, BPD DCU Sgt. Det. Fitzpatrick, PO Cronin and PO Hynes.

10. Report Re: Purchase of Exhibit 3 and 4 by TFA Joao Monteiro from Robert WHITE on 7-06-2001, and acquisition of Exhibits N-5, N-6 and N-7.

### SYNOPSIS

1. On Friday, July 6, 2001, TFA Monteiro acting in an undercover capacity purchased crack cocaine at the Whittier Street Housing Development in the Roxbury section of Boston. TFA Monteiro met with Robert WHITE and on two separate occasions purchased a total of six (6) plastic bags of suspected crack cocaine. TFA Monteiro identified WHITE from a previous drug transaction.

### DETAILS

On Friday, July 06, 2001, TFA Monteiro met with the above mentioned officers to discuss the purchase of crack cocaine at the Whittier Street Housing Development in the Roxbury section of Boston.

2. The Whittier Street Housing Development is under control by the Boston Housing Authority. As mentioned previously, there is wide spread drug distribution being conducted by various individuals in and around the Housing Development.

3. At the conclusion of the meeting, TFA Monteiro was equipped with a transmitting device to record conversations (Exhibit N-5). In addition, an undercover vehicle utilized for the operation was equipped with a concealed video camera (Exhibit N-6, N-7) for video surveillance.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division NKSI | TFA Joao J. Monteiro | |
| District  Intelligence | 14. Approved (Name and Title) | 15. Date |
| Other | Harry G. Brady  Group Supervisor | |

Form - 6
(1996)
  jjm

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. ████████ | 2. G-DEP Identifier ████████ |
|---|---|---|
| *(Continuation)* | 3. File Title ████████ | |

| 4. Page  2  of  5 | |
|---|---|
| 5. Program Code | 6. Date Prepared 06/25/01 |

4. Under constant surveillance, TFA Monteiro, acting in an undercover capacity drove the area of Ruggles, Whittier, and Cabot Streets. On arrival, TFA Monteiro observed three individuals gathered on the sidewalk across the street from a ballpark. TFA Monteiro identified one individual as Robert WHITE, whom TFA Monteiro recognized from two previous drug transactions. Reference is made to DEA 6's under this case file, titled: Purchase of Exhibit 1 and purchase of Exhibit 2, authored by TFA Monteiro. TFA Monteiro further observed WHITE and an individual, who WHITE later identified as, "SMOKE", counting a large sum of money. SMOKE is described as a black male, dark complexion, approximately 22-25 years of age, dressed in all black clothing.

5. TFA Monteiro pulled the undercover vehicle over and WHITE walked up to the passenger side window. TFA Monteiro greeted WHITE and engaged in a drug-related conversation with WHITE. TFA Monteiro negotiated to purchase $200.00 worth of crack cocaine from WHITE.

TFA Monteiro observed WHITE walk over to SMOKE and engaged in conversation. WHITE returned to and entered the undercover vehicle.  TFA Monteiro drove away from the area and pulled over a short distance later.  During the ride, WHITE told TFA Monteiro to see WHITE or a dark skinned individual for crack cocaine.  TFA Monteiro understood that dark individual to be SMOKE. WHITE exited the undercover vehicle and walked over to a black male, on a bicycle, wearing blue jeans, and a gray shirt.  Both walked out of view.

7. Approximately two minutes later, WHITE returned to the undercover vehicle.  WHITE told TFA Monteiro that WHITE would sell three (3) bags to TFA Monteiro for $220.00. WHITE further told TFA Monteiro that the crack cocaine was of pure quality.  WHITE handed TFA Monteiro 3 bags (Exhibit 3), each containing a white substance, believed to be crack cocaine. TFA Monteiro informed WHITE that TFA Monteiro would return later to purchase more crack cocaine. TFA Monteiro handed WHITE a total of $230.00 of OAF, after WHITE asked for an additional $10.00.  Prior to leaving, TFA Monteiro asked WHITE if TFA Monteiro could see one of the other individuals to obtain crack cocaine when WHITE was not available. WHITE told TFA Monteiro to see WHITE's cousin, SMOKE, whom WHITE

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | | |
| *(Continuation)* | | 3. File Title | | |
| 4. Page 3 of 5 | | | | |
| 5. Program Code | | 6. Date Prepared 06/25/01 | | |

indicated was dressed in black clothing.  The above mentioned event was captured on video tape.

8. After the transaction, WHITE exited the undercover vehicle and walked over to the aforementioned individual on the bicycle. TFA Monteiro left the area and returned to a pre-arranged location.

9. Approximately a half hour later, TFA Monteiro under constant surveillance returned to the Whittier Street Housing Development. TFA Monteiro observed SMOKE riding a bicycle in the vicinity of Ruggles and Tremont Streets.  TFA Monteiro pulled up to SMOKE and engaged in conversation.  SMOKE asked TFA Monteiro if TFA Monteiro was looking for something, which TFA Monteiro understood to be crack cocaine.  SMOKE then told TFA Monteiro to wait, rode off, and met with WHITE in the vicinity of 190 Ruggles Street.

10.  TFA Monteiro observed SMOKE and WHITE engaged in conversation.  After a brief conversation, WHITE and SMOKE parted company and WHITE walked to and entered the undercover vehicle.  WHITE and TFA Monteiro engaged in a drug related conversation.  TFA Monteiro negotiated to purchase three (3) bags of crack cocaine from WHITE.  WHITE instructed TFA Monteiro to drive around the corner.

11.  TFA Monteiro drove to the same location where the earlier drug transaction with WHITE took place.  WHITE instructed TFA Monteiro to pull into a parking lot. TFA Monteiro observed WHITE walk over to a parked Honda Accord, bearing Mass. Registration 935-5SI.  TFA Monteiro observed WHITE lean into the passenger side window and retrieve an item. Moments later, WHITE returned to the undercover vehicle. TFA Monteiro observed WHITE holding a plastic sandwich bag in one hand and the other hand was clenched shut. WHITE entered the undercover vehicle and handed TFA Monteiro three (3) plastic bags (Exhibit 4), each containing a white substance, believed to be crack cocaine.  WHITE then took the plastic sandwich bag and showed TFA Monteiro how to utilize the bag for packaging crack cocaine. TFA Monteiro negotiated to purchase Exhibit 4 for $210.00 from WHITE.  TFA Monteiro handed WHITE $210.00 of OAF and secured Exhibit 4.

Form   - 6a
1996

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. ▓▓▓▓▓▓▓ | 2. G-DEP Identifier ▓▓▓▓▓ |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title ▓▓▓▓▓▓ | |
| 4. Page 4 of 5 | | |
| 5. Program Code | 6. Date Prepared 06/25/01 | |

12.  TFA Monteiro agreed to meet with WHITE at a later time to purchase more drugs and WHITE exited the undercover vehicle. The above mentioned event was captured on video tape (Exhibit N-7). TFA Monteiro observed WHITE walk over the aforementioned Honda Accord and passed over money to the passenger. While exiting the parking lot, TFA Monteiro observed that a female driver and black male passenger occupied the Honda Accord. TFA Monteiro left the area, returned to a pre-arranged location, and turned over all evidence to S/A Burke.

13.  This investigation continues.

## CUSTODY OF EVIDENCE

1. Exhibit 3 is three (3) plastic bags containing suspected crack cocaine purchased by TFA Monteiro from Robert WHITE 7/06/2001 in Roxbury section of Boston, MA. TFA Monteiro turned over custody of the Exhibit to TFA Cardoza, who turned the Exhibit over to S/A Burke. S/A Burke maintained custody of the Exhibit until the Exhibit was deposited into the DEA secure overnight vault for safekeeping. At a later date, the Exhibit was retrieved and mailed via RMRRR to the DEA NERL for analysis.

2. Exhibit 4 is three (3) plastic bags containing suspected crack cocaine purchased by TFA Monteiro from Robert WHITE 7/06/2001 in Roxbury section of Boston, MA. TFA Monteiro turned over custody of the Exhibit to S/A Burke. S/A Burke maintained custody of the Exhibit until the Exhibit was deposited into the DEA secure overnight vault for safekeeping. At a later date, the Exhibit was retrieved and mailed via RMRRR to the DEA NERL for analysis.

3. Exhibit N-5 is an original audio cassette tape of (KEL) recorded conversations during the purchase of Exhibit 3 and 4 by TFA Monteiro from Robert WHITE on 7/06/2001 in the Roxbury section of Boston, MA. TFA Cardoza recorded the conversations and turned over custody of the Exhibit to S/A Burke. S/A Burke maintained custody of the Exhibit until copies were made and the original was deposited in the DEA Non-Drug Vault for safekeeping.

Form - 6a
(1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|---|
| **REPORT OF INVESTIGATION** | | ████████ | | ████████ |
| *(Continuation)* | | 3. File Title ████████████ L . | | |
| Page  5  of  5 | | | | |
| 5. Program Code | | 6. Date Prepared 06/25/01 | | |

4. Exhibit N-6 is an original 8mm cassette tape of video recordings made during the purchase of Exhibit 3 by TFA Monteiro from Robert WHITE on 7/06/2001 in the Roxbury section of Boston, MA. TFA Monteiro made the recording and turned over custody of the Exhibit to S/A Burke.  S/A Burke maintained custody of the Exhibit until copies were made and the original was deposited in the DEA Non-Drug Vault for safekeeping.

5. Exhibit N-7 is an original 8mm cassette tape of video recordings made during the purchase of Exhibit 4 by TFA Monteiro from Robert WHITE on 7/06/2001 in the Roxbury section of Boston, MA. TFA Monteiro made the recording and turned over custody of the Exhibit to S/A Burke.  S/A Burke maintained custody of the Exhibit until copies were made and the original was deposited in the DEA Non-Drug Vault for safekeeping.

### INDEXING

1  WHITE, Robert  -  ████████████

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# EXHIBIT 2

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF INVESTIGATION

Page 1 of 4

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|

**5. By:** TFA Joao J. Monteiro
**At:** NEFD/Boston

**6. File Title**

**7.** ☐ Closed ☐ Requested Action Completed
☐ Action Requested By:

**8. Date Prepared**
7-17-01

**9. Other Officers:** G/S Brady, TFA Henley, S/A Desmond, S/A Doherty, TFA MacLaughlin, TFA Gallarelli, PO Baton and O'Toole (BHA PD).

**10. Report Re:** Purchase of Exhibits 5 and 6 by TFA Joao Monteiro from Darryl DOWDELL and Robert SAMPSON on 7-16-2001, and acquisition of Exhibits N-8 and N-9.

## SYNOPSIS

1. On Monday, July 16, 2001, TFA Monteiro acting in an undercover capacity purchased crack cocaine at the Whittier Street Housing Development in the Roxbury section of Boston. TFA Monteiro met with Darryl DOWDELL and Robert SAMPSON and negotiated to purchase $200.00 worth of crack cocaine. TFA Monteiro through Boston Police booking photographs identified both individuals.

## DETAILS

1. On Monday, July 16, 2001, TFA Monteiro met with the above mentioned officers to discuss the purchase of crack cocaine at the Whittier Street Housing Development in the Roxbury section of Boston.

2. The Whittier Street Housing Development is under control by the Boston Housing Authority. As mentioned previously, there is wide spread drug distribution being conducted by various individuals in and around the Housing Development.

3. At the conclusion of the meeting, TFA Monteiro was equipped with a transmitting device to record conversations (Exhibit N-8). In addition, an undercover vehicle utilized for the operation was equipped with a concealed video camera (Exhibit N-9) for video surveillance.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division NKSI | TFA Joao J. Monteiro | 7-17-2001 |
| District Intelligence | **14. Approved (Name and Title)** Harry G. Brady Group Supervisor | **15. Date** 7.17.01 |
| Other | | |

DEA Form - 6
(Jul. 1996)

jjm
1 - Prosecutor

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | |
| *(Continuation)* | | 3. File Title | |

| 4. | |
|---|---|
| Page  2  of  4 | |
| 5. Program Code | 6. Date Prepared  7-17-01 |

4. Under constant surveillance, TFA Monteiro, acting in an undercover
   capacity drove the area of Ruggles, Whittier, and Cabot Streets. On
   arrival, TFA Monteiro observed a group of individuals gathered on the
   sidewalk in the vicinity of Ruggles and Cabot Streets.  TFA Monteiro
   recognized one individual from a previous drug transaction, who goes by
   a street name of SMOKE. TFA Monteiro later learned that SMOKE's true
   identity is Darryl DOWDELL, after viewing a Boston Police booking
   photograph. DOWDELL was wearing a blue checkered shirt and dark blue
   jeans. TFA Monteiro asked DOWDELL for the whereabouts of "TD" (Robert
   WHITE); an individual TFA Monteiro has purchased crack cocaine from in
   the past. DOWDELL indicated that WHITE was in the vicinity of Dudley
   Square.

5. TFA Monteiro left the area, and returned a short time later and pulled
   up to DOWDELL, who was in company with three other youths.  TFA Monteiro
   called out to DOWDELL, who approached the passenger side window of the
   undercover vehicle.  TFA Monteiro negotiated to purchase $200.00 worth
   of crack cocaine from DOWDELL.  DOWDELL left the passenger window and
   engaged in conversation with the other individuals, including Robert
   SAMPSON.  SAMPSON was wearing blue jeans shorts and a gray T-shirt with
   a small logo on the front. TFA Monteiro identified SAMPSON through a
   Boston Police booking photograph.

6. A short time later, DOWDELL returned to the undercover vehicle and
   handed TFA Monteiro six (6) plastic bags of suspected crack cocaine
   (Exhibit 5).  TFA Monteiro handed DOWDELL $100.00 of OAF and DOWDELL
   instructed TFA Monteiro to wait. Moment's later, SAMPSON approached the
   undercover vehicle with DOWDELL.  As SAMPSON leaned in the undercover
   vehicle, DOWDELL placed a plastic bag in SAMPSON' hand and SAMPSON
   handed TFA Monteiro a total of six (6) plastic bags of suspected crack
   cocaine (Exhibit 6). TFA Monteiro handed SAMPSON $100.00 of OAF. The
   above events were captured on video tape (Refer to Exhibit N-9).

7. Both individuals walked away from the undercover vehicle and TFA
   Monteiro left the area. TFA Monteiro returned to a pre-arranged location
   and maintained custody of all evidence.  In addition, TFA Monteiro
   viewed Boston Police booking photographs and positively identified both
   DOWDELL and SAMPSON.

DEA Form      - 6a              **DEA SENSITIVE**
(Jul. 1996)               Drug Enforcement Administration          **1 - Prosecutor**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ████████    2. G-DEP Identifier ████████ |
| | 3. File Title ████████████ |
| 4. Page 3 of 4 | |
| 5. Program Code | 6. Date Prepared 7-17-01 |

8. This investigation continues.

**CUSTODY OF EVIDENCE**

1. Exhibit 5 is six (6) plastic bags containing suspected crack cocaine, purchased by TFA Monteiro from Darryl DOWDELL A/K/A SMOKE on 7/16/2001 in Roxbury section of Boston, MA. TFA Monteiro maintained custody of the Exhibit until the Exhibit was deposited into the DEA secure overnight vault for safekeeping. At a later date, the Exhibit was retrieved and mailed via RMRRR to the DEA NERL for analysis.

2. Exhibit 6 is six (6) plastic bags containing suspected crack cocaine purchased by TFA Monteiro from Robert SAMPSON 7/16/2001 in Roxbury section of Boston, MA. TFA Monteiro maintained custody of the Exhibit until the Exhibit was deposited into the DEA secure overnight vault for safekeeping. At a later date, the Exhibit was retrieved and mailed via RMRRR to the DEA NERL for analysis.

3. Exhibit N-8 is an original audio cassette tape of (KEL) recorded conversations during the purchase of Exhibits 5 and 6 by TFA Monteiro from Darryl DOWDELL and Robert SAMPSON 7/16/2001 in the Roxbury section of Boston, MA. TFA Sgt. Hartley recorded the conversations and maintained custody of the Exhibit until copies were made and the original was deposited in the DEA Non-Drug Vault for safekeeping.

4. Exhibit N-9 is an original 8mm cassette tape of video recordings made during the purchase of Exhibits 5 and 6 by TFA Monteiro from Darryl DOWDELL and Robert SAMPSON on 7/16/2001 in the Roxbury section of Boston, MA. TFA Monteiro made the recording and maintained custody of the Exhibit until copies were made and the original was deposited in the DEA Non-Drug Vault for safekeeping.

**INDEXING**

1. ████████████  -  NADDIS# Negative

---

DEA Form  - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**1 - Prosecutor**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. ▬▬▬▬ | 2. G-DEP Identifier ▬▬▬ |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title ▬▬▬▬ | |
| 4. Page  4  of  4 | | |
| 5. Program Code | 6. Date Prepared  7-17-01 | |

2. DOWDELL, Darryl aka SMOKE  –  ▬▬▬Negative – Male, Black non-
   Hispanic, DOB: 3/25/78, POB: Boston, MA, Address: 650 Columbus Ave.
   Roxbury, MA 02119, SSN: 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.

3. SAMPSON, Robert   –   ▬▬▬Negative – Male , Black non-Hispanic, DOB:
   10/20/76, POB: Boston, MA., Address: 159 Cabot Street #154, Roxbury, MA
   02119, SSN: 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.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**1 - Prosecutor**