UNITED STATES COURT FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.

DARRYL DOWDELL

DOCKET NO. 05-10078-NMG

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The defendant Darryl Dowdell submits this memorandum in support of his argument for a reduction of sentence from the recommended Guideline Range. He argues that his physical and mental handicaps, in light of his offense conduct, qualify him for a variance, pursuant to 18 U.S.C. § 3553(a), and that the recommended Guideline Range, 262 to 327 months, is overly harsh given his offense conduct and life history.

PHYSICAL HANDICAPS

Dr. Spiers' report indicates an integration between Mr. Dowdell's physical infirmities and his intellectual shortcomings. The PSR and Dr. Spiers' report present a complete and accurate assessment of the defects Mr. Dowdell suffered at birth. Rather than repeat all those findings, the defendant will highlight those portions of the reports, and also information received from Mr. Dowdell and his family, that should influence the Court's sentencing decision.

He was born with birth defects that required numerous operations on his genitalia and resulted in present-day deformation of his private parts. He still suffers from urinary incontinence. With one leg shorter than the other, Mr. Dowdell has difficulty running and walks with a limp. He has suffered numerous operations to his hip and leg and is in need of another operation.

These physical limitations had a dramatic impact on Mr. Dowdell's childhood and contributed directly to his criminal conduct as a juvenile and young adult. As a child, he could not engage in "normal" play activity. He constantly soiled himself and was the subject of ridicule. Because of the operations to his hips and legs, he could not walk without the aid of crutches for long periods during his childhood. The other children used to steal his crutches, leaving him outraged and helpless in school while waiting for the bus or on the playground.

The cruel torture and bullying he endured came from his peers and from his own siblings.

He refused to shower in public after physical education classes in fear of exposing his deformed genitalia, leading to punishment from his teacher and further torment from his peers.

Once he was able to maintain his balance independently, he quickly learned that acquiescence would not stop the abuse and he began fighting back. Given the violent environments where he has lived his entire life, he has never stopped fighting.

INTELLECTUAL AND MENTAL HANDICAPS

According to the Boston Public School system Mr. Dowdell's formal education was difficult. He was placed in Special Education classes by the time he was in second grade, with poor results in the Individualized Education Programs devised for him.

His intellectual deficiencies appear to be life-long. His difficulties during his years of formal education were augmented by the diagnosis while in DYS custody at age 14 as being "mildly" retarded. The stigma of being identified as "retarded" and placed in Special Education classes further increased the ridicule he suffered as he was growing up, and is still today a source of humiliation. Along with his physical handicaps, Mr. Dowdell was taunted as a "dummy", and worse.

Although his educators noted his problematic behavioral and academic performance, no efforts were ever made at referring him for psychological evaluations to determine if he were suffering from learning disabilities. Instead he languished in Special Education classes while being "promoted" grade level by grade level in an attempt to "mainstream" his education and keep him on pace with students his age who were achieving at a normal level.

Dr. Spiers currently evaluates Mr. Dowdell as having the intellectual and emotional capacity of a 12-year-old. He disagrees with the diagnosis of Mr. Dowdell of being mentally retarded. He believes that Mr. Dowdell's intellectual and emotional deficiencies are more the product of learning disabilities and possible neurological disorders than of an across-the-board "retardation". As he explained to undersigned counsel, mental retardation will afflict a person in all learning disciplines. Mr. Dowdell could not have taught himself how to read and write, if only at a rudimentary level, were he truly "retarded" in the clinical sense. Whatever the genesis, Mr. Dowdell has documented intellectual deficiencies that have gone untreated or misdiagnosed his entire life. The misdiagnoses and his inability to perform well in school exacerbated his difficulties with his peers and superiors and became the source of the anger that he acted upon.

In spite of his deficiencies he has recently somehow taught himself to read and write. His handwriting makes up in clarity what his prose, punctuation and spelling lack. He passed the Graduate Equivalency examination, no small feat. He took the examination three times before he was able finally to pass it. When asked why he kept

taking the exam, he responds that he wanted to prove to the world that he is not the "retard" they say he is.

He has been shot three times, including once in the face. His family has been threatened with further violence and has lived in fear of retaliation. The physical environment in which he was raised was so threatening that DYS caseworkers were afraid to approach the building in which he lived.

The death of his mother affected him emotionally, as she apparently was the only person in his life who showed him any degree of understanding and affection. Mr. Dowdell was released from DYS custody not long after her death, and began, in his own words, "running wild."

His father is described as a chronic alcoholic who was absent most of Mr. Dowdell's childhood. He is illiterate and currently seems to suffer from some form of age related dementia. His father's illiteracy lends credence to the opinions that Mr. Dowdell's intellectual deficiencies may be organic and inherited. (His father represents that he was a "20-year" employee of the Honeywell Corporation in Brighton, who worked on a computer board assembly line. His father currently is subsisting on long term disability payments. Mr. Dowdell senior is not capable of relating the nature of his alleged disability and the exact years he has been on disability payments, nor is he capable of relating the zip code of the apartment where he currently resides in Hyde Park, MA.)

Mr. Dowdell has submitted, under separate cover, a narrative, unsolicited by undersigned counsel. The narrative was written by Mr. Dowdell with considerable help from another, more litereate, inmate. The narrative reflects Mr. Dowdell's perceptions of his youth and took more than two weeks to compose. Mr. Dowdell is not comfortable speaking in public, and, with some reluctance, gave permission to release the narrative to the Court.

SENTENCE RECOMMENDATION

**"Without treatment, Darryl's behavior can only be expected to deteriorate and he seems to be headed for much more serious trouble than he has already been in."**

That prescient assessment was written by a DYS psychologist when Darryl was 14 years old. (PSR at ¶114) The assessment was reached after Darryl had suffered years of abuse due to his physical and emotional handicaps, along with the problems diagnosed by Dr. Spiers and the PSR. The psychologist noted that Darryl "may be afraid of his own fury" and needed "structure and control."

In spite of that assessment, Mr. Dowdell apparently did not receive treatment. In fact, after Mr. Dowdell was released from DYS custody to some form of supervision, a DYS caseworker wrote that the condition of the building in which Mr. Dowdell lived was

3

so intimidating that "**This worker has been to the home with reluctance and fear. This worker remains (undecided) about returning there again and prefers to conduct meetings or home visits elsewhere.**" (PSR ¶ 81) Instead of receiving the treatment recommended by the DYS psychologist, he was shuttled among shelters, secure facilities, homes and short term care until he was released from DYS jurisdiction when he reached the age of majority.

As predicted, his behavior deteriorated and he became involved in more serious trouble as he grew older. He now faces a recommended GSR of more than 21 years in prison for relatively low-level street dealing in crack cocaine.

According to Dr. Spiers' report, Mr. Dowdell's participation in the offenses for which he stands convicted were the product of his physical, intellectual and emotional disabilities. Individuals like Mr. Dowdell "tend not to spontaneously initiate reasoning or critical thinking, which is difficult for them. As such, they often do not independently exercise socially appropriate judgment. This is even more probable when the individual may be acting in concert with someone with whom they have a dependent relationship, such as Mr. Dowdell may have had with Robert White in this case, and previously with his older brother."(Spiers Page 6)

Not recognizing or providing the treatment the DYS psychologist identified in 1992 contributed to Mr. Dowdell's criminal history and his offense conduct in the case at bar.

Pursuant to the procedures recommended by *Gall v. United States,* 128 S.Ct. 592 (2007), the defendant asserts that for the purposes of establishing his Guideline Sentencing Range, Mr. Dowdell's base offense level is 20, with his Criminal History Category VI. That computation would have placed Mr. Dowdell at a GSR of 70 to 87 months, and reflects the recently enacted "crack" sentencing amendment to the Federal Sentencing Guidelines.

The application of USSG § 4B1.1, the Career Offender Provision, would yield an enhanced GSR of 262 to 327 months.

Under the sentencing system that existed before *United States v. Booker*, 543 U.S. 220 (2005) this Court could have departed downward from the Career Offender Guideline Sentencing Range if it felt that such a designation were not warranted either due to an overstated criminal history category or offense level United States v. Lindia 82 F. 3d 1154, 1165 (1st Cir. 1996).

A court must impose a sentence within the range prescribed by the guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *18 U.S.C. § 3553(b)*. To warrant a departure, a circumstance must "render the case atypical and take it out of the 'heartland' for which the applicable guideline was designed." *United States v. Carrion-Cruz*, 92 F.3d 5, 6 (1st Cir. 1996*).* Among potential

factors justifying a departure, a "discouraged factor" is one "'not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.'" *United States v. Mejia*, 309 F.3d 67, 70 (1st Cir. 2002)(quoting U.S.S.G. § 5, part H, intro. cmt.). "The district court may depart on the basis of a discouraged ground only in an 'exceptional' case." *United States v. Louis*, 300 F.3d 78, 81-82 (1st Cir. 2002); see also U.S.S.G. § 5H1.6; *United States v. Pereira*, 272 F.3d 76, 80 (1st Cir. 2001).

Darryl Dowdell's life is not a demonstration of "lack of guidance as a youth". See USSG § 5H1.12 (a forbidden departure factor). This is a case of a youth who was constantly abused physically and emotionally.

Normally, childhood abuse is a discouraged factor as a base for a downward departure. *United States v. Pullen*, 89 F 3rd 368, 371(7th Cir., 1996) *cert. den.* 117 S. Ct. (1997)

However, in cases where the "factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present," the court may depart downward. *United States v. Ayers*, 971 F. Supp. Q997, 1200 (N.D. Ill. 1997) citing *Koon v. United States* 116 S.Ct. 2035 (1996)

In *Ayers* the District Court found that "In and of itself, the physical and sexual abuse that Ayers endured was extreme but not extraordinary…: see *Ayers supra* at 1200. That court went on to allow a downward departure under the precepts of *Koon*, because *Ayers* "survived not only physical and sexual abuse, but also psychological and emotional torture that has contributed in a significant way to Ayers' criminal behavior." *Id.*

In this matter, the defendant urges the Court to consider such a departure, and in an effort to avoid repetition will focus his arguments for a variance from the recommended Guideline Range, pursuant to *18 U.S.C. 3553(a).*

(Mr. Dowdell asks the Court to take note of the delay between the date his offense conduct and arrest in this matter in 2001, and the date of the federal indictment that removed this case from the state court system to the federal system. Had he been federally indicted shortly after his arrest, there would have been two predicate offenses on his record, one for drug distribution and one for a crime of violence.  Mr. Dowdell suggests that the delay in his prosecution resulted in an adverse effect in his sentence in that it resulted in an increased in his criminal history category. See *United States v. Saldana*, 100 F.3d 100, 104 (1st. Cir. 1997)

(Mr. Dowdell, as reflected in the objections to the PSR filed by predecessor counsel, believes that this prosecution was motivated by retaliation by local law enforcement in Boston after he refused to cooperate in the investigation of the person who shot him in the face in 2003.  He alleges that this prosecution was brought in bad faith and he should be entitled to a downward departure. *Id*. at 102.)

As this Court is well aware, *18 U.S.C. 3553(a)* directs the sentencing Court to consider the need for the sentence imposed:
- (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment for the offense;
- (B) To afford adequate deterrence to criminal conduct;
- (C) To protect the public from further crimes of the defendant; and
- (D) To provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

"After *Booker*, the Guidelines are merely advisory, which means that the district court has considerable leeway to impose a sentence that falls outside of the range suggested by the Guidelines." *United States v. Robinson*, 433 F 3d 31, 35 (1st Cir. 2006). "The court is not bound to impose a sentence within the range the Guidelines recommend, of course, and may depart from it if it reasonably concludes that the other § 3553 factors warrant such a departure." *Id*.

Factors that may have been discouraged or prohibited under the Federal Sentencing Guidelines may now be considered as mitigating factors when applying the precepts of *18 U.S.C. § 3553(a)*. *United States v. Morin*, 403 F.3rd 41 (1st Cir. 2005) See also, *United States v. Burhoe*, 409 F.3d 5(1st Cir. 2005) (remanding for resentencing where Court could not depart based on restrictions of *USSG §5K.2.13*)

Mr. Dowdell argues that his intellectual and emotional shortcomings were contributing factors to his offense conduct and can be considered by the Court in deciding what the appropriate sentence should be in this matter.

*18 U.S.C. § 3553(a)(2)(D)* mandates the so-called "parsimony principle": the Court is obliged to assign a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. As stated above, those purposes include not merely punitive measures but also "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *United States v. Lacy*, 99 F. Supp. 3d 108, 119 (D. Mass. 2000)

As of this moment, Mr. Dowdell is psychologically and physically handicapped. He has in essence no formal education and no job skills. He has bounced between the homes of extended family members and custodial settings since his early adolescence with lip service paid to his needs and problems.

He needs professional help controlling his anger and frustration over the obstacles that have plagued his entire life. His limited self-education and intellectual capacity provide him with a tortured understanding of his problems and how to control his behavior.

The arguments and the assessment of Dr. Spiers are presented to the Court not as an excuse for his past criminal activity but as an aide in providing the Court with an explanation of the factors that contributed to the deterioration of his behavior as he grew older and to provide the Court with a rationale to impose a sentence consistent with the mandates of 18 U.S.C. 3553(a).

That Mr. Dowdell needs psychiatric counseling and drug abuse treatment can not seriously be contested. It is also recommended that the federal Bureau of Prisons be instructed to examine Mr. Dowdell for possible brain damage, as Dr. Spiers believes that he may be suffering from a neurological disorder.(Spiers at page 3, 6) The question for this Court to decide is how long does he need to be confined and treated before he can re-enter society with the possibility of leading a constructive life.

According to Dr. Spiers' report, Mr. Dowdell's participation in the offenses for which he stands convicted were the product of his physical, intellectual and emotional disabilities. (Spiers at Page 6)

The recommended Guideline sentence without a variance or departure would keep Mr. Dowdell in prison until almost his 50th birthday. He argues that such a sentence is unnecessarily harsh in light of his offense conduct and in light of most of the authoritative agencies with which he came into contact during his life (The Boston Public School System, the Department of Youth Services, the various hospitals and clinics where he was treated for his physical problems and the various penal institutions where he has been incarcerated) that either failed to recognize or provided treatment for his needs.

He urges the Court, in determining whether, and to what extent, imprisonment is appropriate based on the *§ 3553(a)* factors, to be mindful of the limitation provided in *18 U.S.C. §3582*: "that imprisonment is not an appropriate means of promoting correction and rehabilitation."

Moreover, "there is not one reasonable sentence. Reasonableness covers a wide span of possibilities, including possibilities outside the guidelines.." *United States v. Pho*, 433 F.3d at 60-61. (1st Cir. 2005)

"Rehabilitation is also a goal of punishment. *18 U.S.C. § 3553 (a)(2)(D).* That goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment". *United States v. Carvajal*, Unreported, and 2005 WL 476125 (S.D.N.Y. 2005) .When punishment is disproportionate to the offense, it squanders resources, creates disrespect for the law, and fails to achieve just punishment.

7

In light of all of the above, I recommend that Mr. Dowdell be sentenced to a period of imprisonment of 180 months. Absent the Career Offender classification, Mr. Dowdell would have been confronted with a GSR of 70-87 months. The recommended sentence is twice as long as the outer limit of that range, and is a 15-year sentence.

It comports with the requirements of *18 U.S.C. 3553(a)* in that it imposes a 15-year period of imprisonment for the sale of less than 5 grams of crack cocaine. The severity of the sentence in light of his offense conduct reflects the seriousness of his criminal activity and also acknowledges his past misconduct, but does not unreasonably punish him.

The 180-month sentence also sends a message to the community that criminal activity has consequences and should deter others who may know Mr. Dowdell from committing similar acts. The Federal Sentencing Commission, in its 15-Year Report in 2004 recognizes that harsh punishment, in particular Career Offender sentences for street level dealers of narcotics does not necessarily have the desired deterrent effect on other dealers. Street dealers are fungible and readily replaceable.

As of this writing, Mr. Dowdell is the emotional, psychological and intellectual equivalent of a 12-year-old in the body of a 28-year-old man. He would be in his forties upon release if the Court adopts the sentence recommended by the defense. Dr. Spiers in his report notes that Mr. Dowdell has problems establishing social relationships. He has few social contacts in the outside world and would in all likelihood have no social contacts when his sentence is over. Mr. Dowdell is concerned that his sentence in this matter will be so long that what little support and contact he still has with his extended family will be over upon his release because his father and aunt will in all likelihood be dead.

During Mr. Dowdell's various periods of incarceration, he has been "warehoused". Limited financial resources in both the county jails and the Massachusetts Department of Corrections prevent Mr. Dowdell from getting the treatment he needs. For the past three years he has been a guest of the Essex County House of Corrections, and not a sentenced inmate. What limited resources they have are logically applied to those under their immediate control who will be re-integrated into the local community. His history of repeated short incarcerations followed by release did not provide him with anything but punishment and release.

The 15-year sentence will also provide Mr. Dowdell with desperately needed medical attention, psychiatric treatment and substance abuse counseling. He also needs formal education and vocational counseling. He has never been gainfully employed, save for one brief summer employment.

It is believed that the Bureau of Prisons can provide him with the structured rehabilitative programs that were recommended for Mr. Dowdell, but not provided, when he was twelve years old.

In *United States v. Martin,* 2008 U.S Appp. LEXUS 5906 *9 (1st Circuit, 2008), the First Circuit Court of Appeals upheld a sentence variance from a recommended GSR of 262 months to 144 months for a defendant who had been classified as a Career Offender. The First Circuit stated that the sentencing Court's "reasons for deviation should typically be rooted either in the nature and circumstances of the offense or the characteristics of the offender; must add up to a plausible rationale; and must justify a variance of the magnitude in question. Id. at *11, citing *United States v. Scherrer*, 444 F. 3d 91, 93 (1st Cir., 2006) (en banc); *United States v. Jimenez-Beltre* 440 F.3d at 514, 519 (1st Cir. 2006).

"[S]entencing becomes a judgement call, and a variant sentence may be constructed "based on a complex of factors whose interplay and precise weight cannot even be precisely described." Id. at [slip op at 5]

Mr. Dowdell urges that the complex of factors in his life and in his offense conduct are such that a variant sentence is called for. The defendant's suggested sentence of 180 months, with the conditions imposed as described above (and to be followed by a period of release of 5 years, with stringent conditions) is sufficient but not greater than necessary to comply with the mandates of 18 U.S.C. 3553(a).

        Respectfully submitted,
        Darryl Dowdell
        By his attorney

Date: June 3, 2008

        /s/Raymond A. O'Hara
        Raymond A. O'Hara
        1 Exchange Place
        Worcester, MA 01608
        BBO# 546366
        508 831-7551

**CERTIFICATE OF SERVICE**

I, Raymond A. O'Hara, appearing attorney for the Defendant Darryl Dowdell in this matter, hereby certify that true copies of the within Motion have this date been mailed, postage prepaid, to all counsel of record and filed electronically with the Court.

DATED: June 3, 2008        /s/Raymond A. O'Hara
        Raymond A. O'Hara, Esquire
        1 Exchange Place
        Worcester, MA 01608
        (508) 831 7551
        BBO #546366

This document was created with Win2PDF available at http://www.win2pdf.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.
This page will not be added after purchasing Win2PDF.